## No. 7051.*

THE SOUTHERN MUTUAL INSURANCE COMPANY OF BATON ROUGE VS. WILLIAM S. PIKE, JUNIOR.

Where it appears that the books, accounts, and assets of a corporation were entrusted by the directors to one who united in himself the offices of president and cashier, and who died without rendering an account of trust, a demand for such an account and for the delivery of the property entrusted to him may be made on his heir who has accepted his succession purely and simply, and prescription cannot commence to run against a demand for the return of such property, until the heir has evinced by an external act, or a declaration inconsistent with, or adverse to his precarious tenure, an open intent to change the origin, cause, and character of his anterior possession.

The entries on the books of a corporation made by a deceased president and cashier, or under his direction, constitute a standing acknowledgment of his liability as against himself and his legal representatives, and form the basis of an account to be rendered by those representatives.

APPEAL from the Fifth Judicial District Court, parish of East Baton Rouge. *McVea*, J.

S. P. Greves, Merrick, Race & Foster, Barrow & Pope, and Geo. L. Bright for plaintiff and appellant:

First—Prescription does not begin to run where property, money, or other effects are in the hands of a fiduciary, until a demand has been made. 30 A. 486 ; 14 A. 216 ; 23 A. 300.

Second—The president and cashier of a corporation continues to be liable to the corporation as president and cashier, even though he may cease to perform the active duties of his office, until his office has terminated in some one of the ways pointed out by law. Field on Corporations, pp. 213, 214, 215.

Third—An agent and trustee is bound to perform his duties in good faith. He cannot acquire the property of the things entrusted to him. Field on Corp. p. 188, secs. 173, 174, p. 358 *et seq.*

Fourth—Failure to carry on its regular business does not dissolve a corporation. Field on Corp. pp. 553, 554, sec. 485.

Herron & Byrd and Richardson & Magruder for defendant and appellee:

First—A suit against the president and cashier of a corporation for an account, and a judgment for what he may owe, is prescribed in ten years from the time he ceases to act as such. C. C. 3457, 3458, 3459; Duranton de la Prescription, vol. 21, p. 95 ; Marcadé, liv. 111, p. 4 ; Boileux, vol. 7, p. 728 ; Marcadé de la Pres. p. 113 ; C. C. 3544 ; Troplong, vol. 2, p. 5, Nos. 474, 478 ; 11 A. 213 ; 10 A. 342 ; 12 A. 257 ;

---

* This case, decided on the 16th December, 1878, was ordered by the late Court to be reported in this volume.

20 A. 568 ; 7 L. 50 ; 9 L. 50 ; 22 A. 151 ; 17 A. 250 ; 15 A. 144 ; 15 A. 534 ; 16 A. 397 ; 7 R. 515.

Second—Parol testimony is not admissible to prove a payment made on debt by a decedent in order to take the debt out of prescription. C. C. 2278 ; 21 A. 350 ; 23 A. 531, 549.

Third—Good faith in a debtor is not necessary to enable him to plead prescription. Duranton, vol. 21, p. 561 ; C. C. 3530.

The opinion of the court was delivered by

DeBlanc, J. The marked ability with which this important cause has been prosecuted and defended, has enlarged its real proportion.

The Southern Mutual Insurance Company was organized by an act of the Legislature of this State, approved on the 12th of March 1855, and—according to the first section of said act—was to continue for and during the term of twenty-five years.

The officers of the company were to be elected on the third Thursday of January of each and every year, and—as such—were to serve until the next general election, and until their successors had qualified.

The powers delegated to the corporation by the statute of 1855, were—by its directors—transferred to its first president and treasurer, William S. Pike, Senior, who died on the 17th of January 1875, more than five years before the term fixed by the act of 1855 for the expiration of the company's charter.

As president, the entire business of the corporation was conducted by him—as treasurer, the whole of its assets were entrusted to his care. In those capacities, he had in his possession—from the date when the company was organized and until his death—the books, papers, bills receivable, cash, and—without exception—all that belonged to it.

He was a trustee invested with almost unlimited authority, and in whom his associates had reposed an unlimited confidence. He died owing and promising an account of his trust. That account, which he was compelled and willing to render, is now asked of one who—as his legal representative—has unreservedly accepted his succession, and who—by the effect of that pure and simple acceptance—is bound to discharge those of his parent's obligations which are still in force.

What is then asked of defendant ? Not exclusively the payment of a debt which may exist, but the existence of which is not yet ascertained—not merely the satisfaction of an obligation for which—primarily—his parent may have been individually liable, but the execution of his parent's obligation as president and treasurer of the corporation, an account of the trust confided to his integrity, the delivery of notes, cash and effects, which—as an agent and a depositary—he held exclusively for and as the absolute property of the insurance company.

As against that part of the otherwise too broad and too collective demand of the company, the only prescription, if any, which might be invoked by defendant, is—beyond a doubt—the prescription *acqui- rendi causa;* and—in this instance—to effectually oppose it to plaintiff's action, he would have to accomplish the more than difficult task of maintaining that one who—as the deceased—combined the responsible functions of president and treasurer of a corporation—could—while acting and holding as such and for others, acquire—by the lapse of time and a prolonged neglect, a valid title to the property left in his charge as an agent.

That pretension is untenable. The deposit must be restored to the depositor as soon as he demands it, even though the contract may have specified when it is to be restored : no surrender can relieve an unfaithful agent from that obligation ; and one, or the heir of one, who possesses for another and not in his own name cannot prescribe, whatever may be the length of his possession, unless he evinces—by an external act, or a declaration inconsistent with or adverse to his precarious tenure—an undisguised and open intention of changing the origin, the cause and the character of his anterior possession.

C. C. 2955 (2926) ; 3510 (3476) ; 3511 (3477) ; 3512 (3478).

" Mais il faut—said DeLaporte—que les actes de contradiction soient formels et positifs ; en sorte qu'il soit constant *extérieurement* qu'on a eu dessein de posséder ce que l'on prétend avoir prescrit, particulièrement à l'égard des choses que l'on ne possède pas sans quelque fait. Il ne suffirait pas, par exemple, qu'un fermier prétendit jouir comme propriétaire, s'il ne l'avait pas manifesté par quelqu'acte, quand même il demeurait cent ans sans payer le prix de la ferme, parcequ'il parait toujours sous la qualité de fermier."

Traité des Prescriptions, pp. 67 and 68.

The company's charter which was " to continue for and during the term of twenty-five years," does not appear to have been forfeited. From March 1861 up to January 1875, Pike alone acted, or at least could have acted as its president and treasurer : he did not officially resign those functions, nor did he ever express to any one of the interested parties, the intention of renouncing the important mandate which he had received from the board of directors. He drew his salary as president up to January 1865 ; declared—in 1863—that he had never taken any thing for insurance that was not equivalent to gold and silver, and— in 1864—removed a considerable quantity of gold and silver from the vault of the old bank in Baton Rouge. In 1871—said his confidential clerk—from entries which he made in Mr. Pike's private books, and under his direction, Mr. Pike still held possession of the papers and assets of the insurance company. In and before the month of August

1874, he remarked in conversations with other parties, that he could and would settle with every one connected with the company, but that he could not do it at that time, for the reason that he could not then withdraw so much money from his business in New Orleans.

The entries made on the books of the corporation, by the deceased himself, and either as president or as treasurer, or by any one under his direction, constitute—as against his succession and legal representatives—a standing acknowledgment of his liabilities in his two recited capacities ; and though that acknowledgment may be explained, corrected or varied, though the apparent liabilities may be increased, reduced or shown to have been *satisfied* or *extinguished*, those entries—such as they are—must necessarily form the basis of the account to be rendered by his representative.

Call Mr. Pike by whatever name the ingenuity of counsel may suggest, he held and possessed—not in his own name—but for others, whose rights he never denied or contested.   Far from openly resisting the exercise of their rights, he—on at least two different occasions—promised to account to the company.   He could not alone and secretly, without any verbal or written notice to any one, without an overt act which might have been construed as amounting to a notice of his intention, change the character of his limited and qualified possession.   His refusal would not have lessened, his promise did not add to, his obligation to account.

Marcadé, de la Prescription, p. 113.

If—as stated—Mr. Pike has converted the company's funds into Confederate currency—if he has invested a portion of those funds in sugar thereafter confiscated by the Federals, in cotton destroyed by the Confederates—if he has done so, not as a speculation and to benefit himself, but as an unavoidable necessity and to prevent an impending loss— if, without his fault, the assets which he held were ingulfed in the common ruin which followed the war—if, from 1863 or 1864, he ceased to be, in all respects and in any sense, the agent of the corporation—if, through him or otherwise, the interested parties were informed of these facts, that information and those facts may be urged by them as an effectual defence, or—according to as yet unrevealed circumstances, as grounds upon which to rest the plea of prescription *liberandi causa*.

The justice of plaintiff's application is partly acknowledged by defendant ; for—in his answer—he alleges that if the corporation has any action against him, it can only be an action to enforce a moneyed demand, the amount of which—he himself admits—must be ascertained by a full liquidation of the affairs of the company.   That liquidation, it is evident, must first be proceeded with, to ascertain the nature and extent of the deceased's liabilities, the character and amount of any

demand which may be enforced against his legal representatives, as also the character of any defence which may be opposèd to that demand.

"On doit poser comme règle certaine, que les détenteurs et leurs héritiers ne peuvent pas invoquer la prescription contre l'action en délaissement des choses qu'ils ont eues à titre précaire, et qui sont en leur pouvoir, et qu'ils ne sont fondés à l'opposer que lorsque ces choses n'étant plus en nature dans leur mains, ils n'ont a défendre qu'à une demande en paiement de leur valeur, ou en dommages intérêts."

Vazeille, Traité des Prescriptions, p. 50, No. 135.

The corporation relies on entries found in books which were in Mr. Pike's possession until his death, in books kept by him or under his immediate supervision, and it behooves those who have accepted his succession, who hold every voucher indispensable to effect the liquidation, the necessity of which is admitted by defendant, to prove what have become of the assets which—from the hands of the late president—have passed into those of the late treasurer—to account for whatever may remain of those realized and deposited assets, and—if they have disappeared—to show when, by whom, under whose authority and for whose benefit they have been disposed of ; otherwise, their liability shall justly be considered as being that fixed and evidenced by the books of the company.

The liability of an agent, and more particularly of that class of agents chosen to represent and manage the banks and insurance companies of one State, must—in the interest of those institutions and of those who deal with them—be measured by the importance and responsibility attached to their respective functions ; and—to hold that, at any time within the term of their office, or àt any time during the period within which their mandate is legally presumed to continue, they can—without notice to the bank, the company or any of their representatives, draw the shroud of any prescription on any of the acts performed or perpetrated by them in their delegated capacities, or that they can claim and exercise the extraordinary privilege of refusing to account to their principals, would be to sanction and proclaim as irrational as dangerous a doctrine, one so manifestly iniquitous that—after its promulgation—no one would dare deal with an insurance company or deposit a dollar in any bank.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from is annulled, avoided and reversed ; and—proceeding to render such judgment as should have been rendered by the lower court,

It is further ordered, adjudged and decreed that—within sixty (60) days from the service upon him of a notice of this judgment—William S. Pike, Junior, render to plaintiff, and file in this case, an account of the administration of William S. Pike, Senior, as president and treasurer of

the Southern Mutual Insurance Company, from the first of February eighteen hundred and sixty-two—the date at which he submitted to the board of directors his last statement of the affairs of said company; and—in default thereof—that plaintiff be allowed to prosecute his suit to final judgment.

It is further ordered that plaintiff's right to oppose and contest said account—when filed—is specially reserved ; that the costs of this appeal be paid by defendant and that those of the lower court abide the final decision of this cause.

Rehearing refused.